M. Anderson Berry, SBN 262879
*aberry@justice4you.com*
Gregory Haroutunian (SBN 330263)
*gharoutunian@justice4you.com*
**CLAYEO C. ARNOLD,
A PROFESSIONAL CORPORATION**
865 Howe Avenue
Sacramento, CA 95825
Telephone: (916) 239-4778
Facsimile: (916) 924-1829

Cliff Palefsky, SBN 77683
*cpalefsky@mhpsf.com*
Matthew C. Koski, SBN 262803
*mkoski@mhpsf.com*
**MCGUINN, HILLSMAN & PALEFSKY**
535 Pacific Avenue
San Francisco, CA 94133
Telephone: (415) 421-9292
Facsimile: (415) 403-0202

*Attorneys for Plaintiff Scott Swift*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Scott Swift,<br><br>               Plaintiff,<br><br>vs.<br><br>ClearCaptions, LLC,<br><br>               Defendant. | Case No. 2:20-cv-00731-MCE-DB<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**(1) RETALIATION IN VIOLATION OF 31 U.S.C. § 3730(h) (False Claims Act)**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff, Scott Swift ("Swift" or "Plaintiff"), by and through his attorneys, brings this action against Defendant ClearCaptions, LLC ( "ClearCaptions" or "Defendant"), pursuant to the anti-retaliation provision of the False Claims Act, 31 U.S.C. §§ 3730(h) ("FCA").

## I.  <u>PRELIMINARY STATEMENT</u>

1.    This is an action to recover damages stemming from Plaintiff's having raised issues to management, including Defendant's Chief Executive Officer ("CEO") Robert Lee Rae ("Rae"), related

to Plaintiff's reasonable belief that Defendant was making false representations about the accuracy of the claims Defendant made to the FCC for reimbursement of IP CTS minutes generated by ineligible accounts or telephones. These complaints brought forth potential FCA violations and facts that could reasonably lead to a viable FCA claim.

2.     Plaintiff was then terminated from his employment by Defendant on account of his lawful and protected conduct, the very next morning after making what turned out to be his final protected complaints to Defendant.

3.     Specifically, Plaintiff came to reasonably believe that Defendant had improperly billed the Federal Communications Commission ("FCC" or the "Commission") for IP CTS calls made on ClearCaptions accounts that ClearCaptions knew or should have known were deactivated or otherwise ineligible for FCC reimbursements. In fact, the entities from which Defendant was spun off have a history of submitting non-compensable minutes for reimbursement and have been fined over $30 million since 2010 for such conduct.

4.     Under Title IV of the Americans with Disabilities Act, the FCC is charged with ensuring the availability of "Telecommunications Relay Services" ("TRS"), which allow hearing- or speech-impaired individuals to place telephone calls to other individuals for the same cost as non-disabled callers. To achieve TRS availability, the FCC relies on IP CTS, a system designed to allow hearing-impaired individuals to place calls on special telephones provided by one of approximately five IP CTS providers across the country.

5.     These special telephones incorporate a screen, similar to an iPad or tablet, that displays real-time captions of what the other party to the conversation is saying. The special telephone connects to the standard telephone line and the internet concurrently; the callers speak over the telephone line, while a Communications Assistant ("CA") employed by the IP CTS provider listens in and captions the call for the hearing-impaired user.

6.      IP CTS providers then get paid from the FCC through its TRS Interstate Cost Recovery Plan ("TRS Fund"). Initially, the FCC reimbursed IP CTS providers at a rate of $1.9467 per minute for each captioned call. The rate changed to $1.75 per minute for July 1, 2018 to June 30, 2019; then to $1.58 per minute from July 1, 2019 to June 30, 2020.

7.      The TRS Fund not only compensates IP CTS providers for compensable minutes of service to registered, certified callers, the TRS Fund also compensates providers for the reasonable administrative cost of furnishing these services. IP CTS providers, such as Defendant, are eligible to receive payments from the TRS Fund as long as the provider offers legitimate services under 47 C.F.R. § 64.601, *et seq*.

8.      Over the past decade, the demand for captioned telephone services has increased substantially, in part because of the aging population and the hearing impairments associated with aging. From 2011 to 2017, the annual IP CTS minutes of service grew from approximately 29 million to over 360 million. The compensation paid to IP CTS providers for the 2018-2019 period was just under $900 million and is estimated at $913 million for the 2019-2020 period. At $1.58 per minute, that amounts to 578 million minutes.

9.      Because TRS is intended to benefit only hearing- or speech-impaired individuals, the FCC and Congress have stated the obvious: Calls involving callers without these impairments are not reimbursable by the TRS Fund. But, as described in detail below, ClearCaptions continued to bill for minutes generated by its telephones that it knew or should have known are associated with deactivated or otherwise ineligible accounts. Ineligible accounts include the use of devices that have been deleted from ClearCaptions' system but are being used by individuals that have not certified themselves as hearing- or speech-impaired and/or have not registered as end-users.

10.     Defendant certified in its monthly reimbursement claims to the government that the billing is accurate, knowing that their claims include minutes for deactivated or otherwise ineligible accounts.

In their annual reports to the FCC, where ClearCaptions must "demonstrate[e] compliance with the mandatory minimum standards established for Internet-based TRS providers under [47 C.F.R. §] 64.604," ClearCaptions falsely certifies that "all statements of fact, as well as all documentation contained in this submission, are true, accurate, and complete." This representation of past performance is false because billing for deactivated and ineligible accounts violates the mandatory minimum standards.

## II.    <u>JURISDICTION AND VENUE</u>

11.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, and 31 U.S.C. §§ 3730(h)(2) and 3732. Jurisdiction is proper under the FCA as the TRS Funds at all times relevant to this Complaint are government funds, as more fully described herein.

12.    The Court may exercise personal jurisdiction over Defendant under 31 U.S.C. § 3732(a), because Defendant is located and/or transacts business in this District. For the same reason, venue is proper in this District under 31 U.S.C. §§ 3730(h)(2) and 3732, and 28 U.S.C. § 1391(b) & (c).

## III.    <u>PARTIES</u>

13.    Plaintiff Scott Swift is a citizen of California residing in Sonoma County. From February 2017 through September 24, 2019, he was employed as the Senior Director of Customer Experience at ClearCaptions' headquarters in Roseville, California. With over 40 employees reporting to him, Mr. Swift led the department in charge of understanding customer needs, customer retention, and customer satisfaction. He was part of the core leadership team that directly reported on a weekly basis to ClearCaptions and Rae. He was also responsible for reviewing certain non-compensable minutes for government reimbursement, and regularly attended the monthly meetings where the leadership team determined which minutes to claim reimbursement from the government.

14.    Defendant ClearCaptions, LLC, is a limited liability corporation formed in Delaware, licensed to do business in California, and located at 3010 Lava Ridge Court, Suite 100, Roseville,

California 95661. ClearCaptions provides IP CTS services throughout the United States. ClearCaptions is owned by multiple funds, all of which are controlled by Reservoir Capital Partners, L.P. ("Reservoir").

## IV.    FACTUAL BACKGROUND AND REGULATORY FRAMEWORK

### A.    The False Claims Act

15.    The FCA prohibits the submission of false or fraudulent claims for payment to the United States or the making of false statements for the purpose of causing a false claim to be paid.

16.    A violation of the FCA occurs when a person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B).

17.    An FCA violation also occurs where a person "conspires to commit a violation of subparagraph (A), (B)[.]" 31 U.S.C. § 3729(a)(1)(C).

18.    One definition of "claim" under the Act is "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that . . . is presented to an officer, employee, or agent of the United States." 31 U.S.C. § 3729(b)(2)(A)(i).

19.    Further, 31 U.S.C. § 3730(h)—the anti-retaliation provision of the FCA—provides, in relevant part, "(1) Any employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of . . . efforts to stop 1 or more violations of this subchapter."

### B.    TRS and Internet Protocol Captioned Telephone Service Explained

20.    Telecommunications Relay Service ("TRS") is a telecommunications service that allows persons with certified hearing or speech-impairments to place and receive telephone calls at no additional

cost.[1] TRS gives impaired citizens equal access to telecommunications in the United States. TRS is available for local and long-distance calls throughout the U.S., Puerto Rico, and the U.S. territories.

21.    The Americans with Disabilities Act directs the FCC to ensure that telecommunications services are available and accessible to people with hearing or speech impairments. *See* Pub. L. No. 101-336, tit. IV, § 401, 104 Stat. 327, 366 (1990) (codified as amended at 47 U.S.C. § 225). TRS enables a person who is "deaf, hard of hearing, deaf-blind, or who has a speech disability to engage in [telecommunications] . . . in a manner that is functionally equivalent to the ability of a hearing individual." 47 U.S.C. § 225(a)(3). The FCC must also ensure that TRS is "available, to the extent possible and in the most efficient manner" to people with hearing and speech impairments. 47 U.S.C. § 225(b)(1).

22.    There are several types of TRS, but only one is relevant here: Internet Protocol Captioned Telephone Service ("IP CTS"), which uses a special telephone that has a color touchscreen, similar to an iPad or tablet, to display captions in real-time. These "captioned telephones" allow the hearing-impaired user to listen to the other party and read captions of what that party is saying.

23.    The telephone connects to the standard telephone line and the internet concurrently.[2] The telephone line is used to connect the hearing-impaired party to the other party on the call. IP CTS uses the internet connection, rather than the telephone line, to allow a Communications Assistant ("CA") to listen to the call and provide real-time captions that appear on the screen for the hearing- or speech-impaired caller.

---

[1]  FCC, *Telecommunications Relay Service – TRS*, available at: https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs (last accessed Apr. 20, 2023). *See* 47 U.S.C. § 225(d)(1)(D) (regulations "require that users of [TRS] pay rates no greater than the rates paid for functionally equivalent voice communication services with respect to such factors as the duration of the call, the time of day, and the distance from point of origination to point of termination"); *see also* 47 C.F.R. § 64.604(c)(4).

[2] ClearCaptions provides the special telephone to the customer at little or no cost, locking them into the system as long as the customer chooses to use that particular account or telephone.

24.    The CA acts as a sort of translator for the parties by listening to what the non-impaired party says and "re-voicing" it into a computer (the parties cannot hear or communicate with the CA). Voice-recognition software captions the CA's re-voicing into text for the hearing-impaired party to read on the screen on the special telephone.[3] The CA does not type or transcribe in any way; re-voicing apparently allows the captions to appear on the IP CTS users' telephones faster than transcription.[4] The CA is employed by the IP CTS provider and is located remotely either in the U.S. or extraterritorially.

25.    IP CTS providers, like ClearCaptions, are compensated for the costs of providing the service by the FCC's Interstate TRS Fund ("TRS Fund").[5] TRS funds are funds belonging to the United States. Monies in the TRS Fund have been included in the United States budget since 1995 and apportioned by the Office of Management and Budget and are considered to be appropriated funds. Because the TRS Fund is included in the federal budget, the FCC is required to include the TRS Fund in its annual financial statement. Expenditures from the TRS Fund reduce the government's and FCC's total budgetary resources.

26.    Because the TRS program is intended only for hearing and speech-impaired individuals, the FCC has ruled that TRS calls involving a user who is not certified as hearing or speech impaired are not eligible for reimbursement by the TRS Fund. The mandatory minimum standards require that IP CTS providers register their clients with detailed personal information, and require the customer provide a

---

[3]  Apparently voice recognition technology is not advanced enough to directly caption the non-impaired caller's speech. As described, this is the IP CTS transcription process used during the relevant time.

[4]  FCC, *Consumer Guide: IP Captioned Telephone Service*, available at: https://www.fcc.gov/sites/default/files/ip_captioned_telephone_service.pdf (last accessed Apr. 20, 2023).

[5]  IP CTS calls are funded through mandatory contributions made to the TRS Fund. *See* 47 C.F.R. § 64.604(c)(5)(iii)(E) (implementing 47 U.S.C. § 225(d)). The costs for providing TRS are passed on to all consumers of telecommunications services by intrastate and interstate common carriers, either as a surcharge on their monthly service bills or as part of the rate base for the state's intrastate telephone services. *See* 47 U.S.C. § 225(d)(3)(B); 47 C.F.R. § 64.604(c)(5)(iii)(A).

written "self-certification" that they are hearing- or speech-impaired. *See* 47 C.F.R. § 64.611(j).

27.    To obtain reimbursement from the TRS Fund, each IP CTS provider submits a monthly claim for reimbursement to the TRS Fund administrator for each registered, certified customer.[6] Each such claim for payment lists the requesting provider's total number of compensable minutes of conversation time, to which the reimbursement rate is applied. Additionally, providers of TRS are entitled to recover their reasonable costs of providing service in compliance with the FCC's service rules.

28.    Until June 30, 2018, the rate collected by ClearCaptions, and other IP CTS providers was $1.9467 per minute. The FCC adjusted that rate to $1.75 per minute for July 1, 2018 to June 30, 2019; then to $1.58 per minute from July 1, 2019 to June 30, 2020.

### C.    Providers Certify Compliance with Federal Laws

#### i.    Certifications in the Application

29.    To be compensated from the TRS Fund for the costs incurred in providing services to eligible users, IP CTS providers must first be certified by the FCC. The IP CTS registration and certifications requirements are very specific, setting out exactly how IP CTS providers and users must comply with federal laws. *See* 47 C.F.R. § 64.606. For instance, an IP CTS applicant must provide "a list of individuals or entities that hold at least a 10 percent equity interest in the applicant, have . . . de facto control over the applicant, a description of the applicant's organizational structure, and the names of its executives, officers, members of its board of directors . . . and managing members (in the case of a limited liability company)." 47 C.F.R. § 64.606(a)(2)(ii)(B).

30.    Applicants must also submit "a description of measures taken . . . to ensure that they do not and will not request or collect payment from the TRS Fund for service to consumers who do not

---

[6]  The TRS Fund is overseen by the FCC but administered by a private contractor selected by the FCC that acts as an agent of the United States. *See* 47 C.F.R. § 64.604(c)(5)(iii). By a series of appointments pursuant to the FCC's rules, the National Exchange Carrier Association ("NECA") served as TRS Fund administrator from the TRS Fund's inception in 1993 through June 30, 2011. Since July 1, 2011, Rolka Loube Saltzer Associates ("RLSA") has served as TRS Fund administrator.

satisfy the registration and certification requirements in § 64.604(c)(9), and an explanation of how these measures provide such assurance." 47 C.F.R. § 64.606(a)(2)(ii)(F).

31.    Further, the applicant must have a senior executive with "first hand knowledge of the accuracy and completeness of the information provided" certify as follows:

> I swear under penalty of perjury that I am _____(name and title), _____an officer of the above-named applicant, and that I have examined the foregoing submissions, and that all information required under the Commission's rules and orders has been provided and all statements of fact, as well as all documentation contained in this submission, are true, accurate, and complete.[7]

32.    Finally, the applicant must certify that the provider will not violate the FCC's rules and federal laws.[8] 47 CFR § 64.604(c)(5)(iii)(D)(1). The same certification attestations are required when a company applies to be re-certified.

### ii.    Certifications in the Annual Reports

33.    Once certified, regulations require IP CTS providers to also file with the FCC, on an annual basis, a report demonstrating that they are in compliance with § 64.604; that is, the mandatory minimum standards that IP CTS providers must follow (these standards are described below). In the Annual Report, a senior executive with first-hand knowledge must certify that "all statements of fact, as well as all documentation contained in this submission, are true, accurate, and complete." 47 C.F.R. § 64.606(g). The Annual Report, among other things, summarizes past actions.

///

///

---

[7] 47 C.F.R. § 64.606(a)(2)(v).

[8] Data submitted to the TRS Fund administrator is also used to determine TRS Fund revenue requirements and the per-minute compensation rate. TRS providers are also required to retain all data to support claims for payment from the TRS Fund for five years. *See* 47 CFR § 64.604(c)(5)(iii)(D)(7). The TRS Fund Administrator and the FCC have the authority to examine and verify TRS provider data as necessary to assure the accuracy and integrity of TRS Fund payments. 47 CFR § 64.604(c)(5)(iii)(D)(6).

### iii.    Certification in the Monthly Claim for Payment

34.    On a monthly basis, an IP CTS provider, such as ClearCaptions, submits a claim for payment to the FCC for the minutes the provider captioned for end-users.  In each monthly claim for payment, the IP CTS provider must have a senior executive with first-hand knowledge certify that, among other things, "[m]inutes submitted to the Fund administrator for compensation were handled in compliance with section 225 of the Communications Act and the Commission's rules and orders[.]" *See* 42 C.F.R §§ 64.604(c)(5)(iii)(D)(5) and (I).

35.    Thus, as described above, ClearCaptions and Defendant Rae, with the Reservoir Defendant's approval, have expressly sworn and certified – on multiple occasions – that they have and will abide by section 225 of the Communications Act of 1934, as amended (codified as 47 U.S.C. § 225), and the FCC's rules (codified as 47 C.F.R. § 64.601, *et seq*.).

### D.    IP CTS Providers Must Comply with Federal Laws

36.    By making the above-referenced certifications, an IP CTS provider certified, in part, that it would comply with 47 C.F.R. § 64.604, the mandatory minimum standards. These mandatory minimum standards set forth certain operational and customer-service requirements that the IP CTS provider must follow. The standards are wide-ranging, from specifying the technical types of calls that providers must handle to establishing the processes for addressing customer complaints.

37.    Importantly, the mandatory minimum standards require that an "IP CTS provider shall not engage in any practice that the provider knows or has reason to know will cause or encourage: (A) False or unverified claims for TRS Fund compensation; (B) Unauthorized use of . . . IP CTS; (C) The making of . . . IP CTS calls that would not otherwise be made; or (D) The use of . . . IP CTS by persons who do not need the service in order to communicate in a functionally equivalent manner." 47 C.F.R § 64.604(c)(13).

38.    Moreover, an "IP CTS provider shall not seek payment from the TRS Fund for any minutes of service it knows or has reason to know are resulting from the practices listed in paragraph (c)(13)(i) of this section or from the use of IP CTS by an individual who does not need captions to communicate in a functionally equivalent manner." *Id.* If the provider does become aware of practices that violate these rules, the provider "shall, as soon as practicable, report such practices to the Commission or the TRS Fund administrator." *Id.*

39.    The mandatory minimum standards, in conjunction with 47 C.F.R. § 64.611(j), also set forth important rules regarding the requirements that IP CTS providers must follow to ensure their end-users are, in fact, persons with hearing- and speech-impairments. These requirements require the IP CTS provider to collect specific "registration" information from the end-user, along with an end-user's written "self-certification" that the user is impaired. *See* 47 C.F.R. § 64.611(j). The required registration information includes the consumer's full name, date of birth, last four digits of the social security number, full residential address, and telephone number.

40.    For end-users who self-certify after August 28, 2014, the IP CTS provider must obtain a written certification from the consumer that states:

(A)    The consumer has a hearing loss that necessitates use of captioned telephone service;

(B)    The consumer understands that the captioning on captioned telephone service is provided by a live communications assistant who listens to the other party on the line and provides the text on the captioned phone;

(C)    The consumer understands that the cost of captioning each internet protocol captioned telephone call is funded through a federal program; and

///

///

///

(D)     The consumer will not permit, to the best of the consumer's ability, persons who have not registered to use internet protocol captioned telephone service to make captioned telephone calls on the consumer's registered IP captioned telephone service or device.[9]

41.     By certifying to follow the mandatory minimum standards, an IP CTS provider agrees that "[n]o person shall use IP CTS equipment or software with the captioning on, unless . . . [s]uch person is registered to use IP CTS[.]" 47 C.F.R § 64.604(c)(11)(ii).

42.     When ClearCaptions first applied to be certified as an IP CTS provider on April 18, 2016, Rae certified that ClearCaptions would abide by these registration and certification regulations. Defendant expressly agreed to this by adding: "ClearCaptions ensures that it will not request compensation for minutes attributable to customers that do not meet the Commission's registration and certification requirements."

### E.     Defendant's Past Violations of FCC Rules

43.     ClearCaptions first began providing IP CTS services in 2011. At that time and up through February 15, 2017, ClearCaptions was a wholly-owned subsidiary of Purple Communications, Inc. ("Purple"). Purple provided TRS in addition to IP CTS, including Video Relay Service ("VRS") and IP Relay. Rae served as Purple's CEO beginning in April 2014.

44.     Purple has a long history of defrauding the FCC. For instance, in 2010, Purple agreed to an FCC Consent Decree and was required to pay back approximately $22 million for overbilling the TRS Fund by artificially inflating TRS usage.

45.     Further, in December 2015, the FCC imposed a penalty of $11,937,549 against Purple for failing both to submit accurate data to the TRS administrator and to use a reasonable process to verify the registration information of thousands of TRS users. In issuing this penalty, the FCC stated that Purple

---

[9]  47 C.F.R § 64.611(j).

had submitted "claims to the Administrator for compensation from the TRS Fund based on the call minutes generated by False Name users, which led to Company receiving almost $[REDACTED IN SOURCE] million in reimbursements from the TRS Fund to which it was not entitled." The FCC also noted that "Purple has a history of submitting non-compensable minutes for reimbursement and that such conduct persists."

46.    Then, on February 15, 2017, the FCC announced a $9.1 million settlement with Purple and CSDVRS[10] that resolved the 2015 penalty and other additional investigations and pending matters that the FCC had against the companies. Moreover, as part of the February 15, 2017 settlement, the FCC instituted another Consent Decree on Purple that included an onerous Compliance Plan.

### F.    Defendant's Attempt to Separate from Purple

47.    To escape from under the burdensome obligations imposed by the Compliance Plan, Purple attempted to spinoff ClearCaptions, LLC into an independent entity just one day before the Consent Decree went into effect.

48.    Having seen the writing on the wall, Purple's attempt to shake free from the upcoming Consent Decree requirements was planned at least six-weeks earlier, when on December 29, 2016, Purple sent notice to the FCC Secretary "that, effective immediately, Purple will transfer its Conditional Internet Protocol Captioned Telephone Service Certification to ClearCaptions, LLC ("ClearCaptions"), a wholly owned subsidiary of Purple."

49.    Only days after ClearCaptions, LLC took over Purple's IP CTS business, on March 9, 2017, ClearCaptions' shell game should have been clear to the FCC. Michael Strecker (ClearCaptions' VP of Regulatory & Strategic Policy) notified the FCC's Deputy Chief of the Disability Rights Office:

---

[10]  "ZVRS Holding Company owns two VRS subsidiaries: CSDVRS, LLC d/b/a ZVRS ("ZVRS") and Purple Communications, Inc. ("Purple"), the latter of which it acquired in February 2017." *Sorenson Communications, LLC v. FCC, et al.*, 897 F.3d 214, n. 1 (D.C. Cir. 2018).

ClearCaptions, LLC (ClearCaptions) hereby notifies the Federal Communications Commission . . . that, effective February 14, 2017, ClearCaptions' ownership structure has undergone the following organizational changes.

First, Purple Communications, Inc. ("PCI") distributed ClearCaptions equity to Purple Intermediate Holding Co., Inc. ("PIHC"). After the distribution of ClearCaptions equity to PIHC, PIHC contributed the equity of PCI to ZVRS Holding Company in exchange for a minority interest in ZP 2016 Holdings, LLC. Additionally, the following parent company names were changed as part of this transaction:

- Purple Intermediate Holding Co., Inc. was changed to VRS-CC Intermediate Holding Co., Inc.
- Purple Holding Co., LLC was changed to VRS-CC Holding Co., LLC

Next, Clearlake Capital Partners I, LP distributed all interest in VRS-CC Holding Co., LLC ("VRS-CC HC") to newly formed Reservoir VRS-CC SPV, LLC. Reservoir VRS-CC SPV, LLC is owned by multiple Funds, all of which are controlled by Reservoir Capital Partners, LP. Reservoir Capital Partners, LP is the General Partner of Reservoir VRS-CC SPV, LLC.

50.     ClearCaptions claimed this was retroactive to February 14, 2017, the day *before* the February 15 Order and Consent Decree was made public and effective. In its 2018 Annual Report, Purple later clarified that ClearCaptions was, on paper anyway, no longer affiliated with Purple at all: "When ZVRS Holding Company acquired Purple on February 15, 2017, ClearCaptions was not acquired."

51.     Along with its structural ownership changes, Robert Rae (subject to the Compliance Plan while at Purple) left Purple to become CEO and president of ClearCaptions. He brought with him the gang that previously worked for him at Purple, including Michael Strecker, John Kelleher (CFO), Mark Gale (Controller) and Paul Kocher (ClearCaptions' Director of Business Support & Sales and Operations Planning), among others.

### G.    ClearCaptions Faces Mounting Financial Pressures

52.     Free of the Consent Decree burden and Purple's shady past, ClearCaptions was initially considered a huge success. ClearCaptions was named the Number 1 fastest-growing company in the Sacramento Area by the *Sacramento Business Journal* for 2017 with an amazing 629.73 percent growth

from 2014-2016.[11] ClearCaptions reported its 2016 revenue as $27 million. ClearCaptions again took the top spot on the *Sacramento Business Journal's* list of fastest-growing companies in 2018, with a 402 percent gain.

53.    "It's amazing to see companies with [growth] greater than $10 million on this list [of fastest-growing companies]," said David Lichtman, Publisher of the *Sacramento Business Journal* at the awards event for ClearCaptions' achievement. "But, ClearCaptions is amazing to do this at $50 million. In the 24 years we've been running this list only three companies have held the number 1 spot for 2 consecutive years. A big congratulations to ClearCaptions for maintaining their exponential growth."

54.    That exponential growth, however, was fueled by what Plaintiff came to believe was fraud.

55.    Although the *Sacramento Business Journal* praised ClearCaptions supposed growth, in reality ClearCaptions was reeling from the FCC's crackdown on fraudulent minutes and its decision to substantially lower per-minute reimbursement rates.

56.    Beginning in early 2018, ClearCaptions complained to the FCC Secretary that "IP CTS is structured in a way that a provider cannot make a profit until it reaches a certain scale" – a scale ClearCaptions admitted it had not reached. ClearCaptions argued that reducing reimbursement from $1.9467 per minute for each captioned call to $1.75 in July 2018, then to $1.58 in July 2019, "will be very damaging" to ClearCaptions' ability to make a profit. "If the Proposed Rates take effect, ClearCaptions is faced with [REDACTED IN SOURCE]; further, we may lose financial support and be forced to stagnate growth[.]"  ClearCaptions continued to hound the FCC to adopt different reimbursement models so that the company can become profitable.

---

[11]  Sacramento Business Journal, *The List: Sacramento area's Fastest-Growing Companies Ranked by Percent growth 2014-2016*, available at: https://www.bizjournals.com/sacramento/subscriber-only/2017/08/11/the-list-sacramento-areas-fastest.html (last accessed Apr. 20, 2023).

57.     ClearCaptions' incessant pleas, however, have not changed the FCC's decision to lower per-minute reimbursements. This, combined with ClearCaptions' poor IP CTS production in 2018 and 2019, and the poor performance of its newest telephone, *Blue*, unveiled in May 2019, kept ClearCaptions off the *Sacramento Business Journal's* list for 2019. More importantly, it kept Defendant from being profitable. In the summer of 2019, Rae told the leadership team, including Plaintiff, that ClearCaptions could not make the upcoming payroll.

58.     Defendant, however, was determined to take whatever steps were necessary, even illegal ones, to keep ClearCaptions in business. Rae micromanaged the operation and drilled into every employee that they should be scouring the system for reimbursable minutes. Rae's message to employees, including Plaintiff, was clear and repetitive: "Work 24/7 to find minutes!"

59.     The last thing ClearCaptions wanted to admit were the reports from frontline employees, including Plaintiff, that ClearCaptions systemically submitted claims to the TRS Fund for minutes that were false. This was especially true in the summer of 2019, after *Blue* was unveiled and when ClearCaptions was having trouble making payroll.

## V.    **DEFENDANT'S SCHEMES**

60.     Since at least February 2017, Plaintiff believes Defendant has improperly billed the FCC for IP CTS calls made on ClearCaptions accounts that ClearCaptions knew or should have known were deactivated or otherwise ineligible for FCC reimbursements. Thus, ClearCaptions is not in compliance with the "mandatory minimum standards" and other FCC rules.

61.     As described below, ClearCaptions knew or should have known that its telephones linked to deactivated accounts were being used by people related or unrelated to former certified users. These end-users, however, were not themselves certified or registered as required by FCC rules and regulations. Once IP CTS accounts are deactivated, any calls made under the account number or by the associated telephone are unauthorized calls by uncertified and/or unregistered individuals.

62.    Defendant also instructed employees to contact end-users in a way that violated mandatory FCC rules by encouraging customers to make calls they otherwise would not have made.

63.    The minutes generated because of encouragement from ClearCaptions, and by uncertified or unregistered end-users, are non-compensable.[12] Yet, ClearCaptions sought and received payments for those minutes.

A.    **Defendant's System for IP CTS Call Tracking and Billing**

64.    To be reimbursed for eligible calls from the TRS Fund, ClearCaptions must add up all its billable minutes each month and submit them to the FCC. Under the regulations, a "senior executive" with first-hand knowledge must certify that the submitted minutes are true and accurate and are not in violation of relevant regulations. *See* 42 C.F.R §§ 64.604(c)(5)(iii)(D)(5) and (I). Defendant Rae certifies ClearCaptions' billable minutes every month.

65.    Compiling the minutes is relatively straightforward. Under 47 C.F.R. § 64.604(c)(5), ClearCaptions must use an automated record keeping system to capture data, which is then submitted to the TRS Fund administrator in a standardized format.[13] ClearCaptions uses a database software system called Couchbase to collect and track end-users' information, like calls and corresponding minutes.

66.    Couchbase is an open-source database software package used for complex, interactive applications. It provides the means for organizing, managing, and analyzing large amounts of data. For example, Couchbase stores and organizes the end-user data of ClearCaptions' customers, including account information, corresponding telephone/device serial numbers, call start and end times, and intricate specifics programmed into the system such as whether minutes are billable.

[12] *See* 47 C.F.R § 64.604(c)(11)(ii); 47 C.F.R § 64.604(c)(13); 47 C.F.R. § 64.606(a)(2)(F); 47 C.F.R. § 64.611(j); 47 U.S. Code § 225(b).

[13]    ClearCaptions certified compliance with this mandatory standard in its 2016 application for IP CTS certification.

67.     Most ClearCaptions employees do not interface with Couchbase. Instead, most employees primarily use a "customer relationship management" ("CRM") tool – in this case, a Salesforce.com program – to interact with end-user data. ClearCaptions uses the Salesforce.com CRM tool because the program is designed to simplify processes for users who typically do not have the programming experience necessary for complex systems like Couchbase.

68.     The Salesforce.com program exchanges information with Couchbase using another software package called Talend. Talend is an open-source data integration platform that provides various software and services for, among other things, data integration.

69.     By way of example, if ClearCaptions learns that an end-user has died, the account must be deactivated. A ClearCaptions employee would open the Salesforce.com CRM, access the customer's account, and simply click on a dialog box next to "Deactivate." This action prompts Talend to tell Couchbase that the end-user's account is deactivated. The Couchbase system is then programmed to deactivate the account, so no further minutes are generated.  According to Plaintiff, Couchbase is also supposed to "brick" the associated telephone; that is, the end-user's telephone, identified by its serial number in Couchbase, is supposed to be deleted from the system to ensure no additional minutes are billed to the TRS Fund from the account or the associated telephone. That was not happening, and Defendant knew or should have known it.

70.     Shortly after the end of each monthly billing cycle, Rae held a "Minute Review Meeting" with the entire ClearCaptions leadership team. During the relevant time, the team included Rae, John Kelleher (CFO), Paul Kocher, Mitchell McMahon (VP of Strategy Execution), Mark Gale (Controller), Corrine Perritano (COO), Plaintiff Swift (Senior Director of Customer Experience), Michael Strecker, and Tracy Mendonsa (Compliance and Investigations Manager).

71.     Part of Paul Kocher's job—like it was at Purple—was to facilitate the monthly billing reporting process (data quality, filtering data, and reporting) to report to the FCC and "company partners."

He was responsible for gathering and organizing the information that detailed the billable minutes. Each member of the leadership team had a different area of the system to review for billable minutes. One day before the meeting, Kocher would supply team members with a spreadsheet that detailed all minutes for the previous month as reflected in Couchbase.

72.    Swift was tasked each month with reviewing minutes associated with customer service issues. This included, for instance, end-users' minutes for calls they made to ClearCaptions' customer service lines; ClearCaptions employees' outbound calls to customers regarding customer service issues; solicitation calls to customers' lines from third-party telemarketers; and any international inbound and outbound calls.[14]

73.    At the "Minute Review Meetings," each member of the leadership team discussed with the group, including Rae, which minutes were eligible or ineligible for reimbursement. This was how Rae supposedly fulfilled the requirement under 47 C.F.R. § 64.604(c)(5)(iii)(D)(5) that he had "first hand knowledge" of the accuracy of the submitted minutes.

74.    Once ClearCaptions' leadership team determined all eligible minutes for the previous month, Kocher compiled the agreed upon minutes, then Rae certified them as accurate and true and submitted the claims to the FCC and TRS Fund administrator for reimbursement in a "Reimbursement Detail Request." These certifications are in addition to the certifications Rae submitted to the FCC in the provider Certification Applications, the certification amendments, and the Annual Reports certifying that ClearCaptions was in compliance with § 64.604, the "mandatory minimum standards."

**B.    Non-Compensable Minutes Systematically Billed to the TRS Fund**

75.    User accounts are deactivated frequently. Considering the majority of end-users are hearing-impaired adults over 70 years old, the reality is that people die or become unable to use the

---

[14]  Although regulations state that billing for international calls will not be reimbursed by the TRS Fund, Defendant instructed employees not to filter out calls to or from Canada. *See* 47 U.S. Code § 225(b)(1).

telephone. Plaintiff was not the only ClearCaptions employee that was actively deactivating accounts. He had approximately 42 employees under him in the Customer Experience department, plus there were another 150 employees companywide. Of the approximately 45,000 ClearCaptions customers, Plaintiff estimates that 5-10 percent were deactivated on a yearly basis. Plaintiff believed that the minutes generated by deactivated accounts could be in the millions.

76.     As far back as early 2017, shortly after Swift was hired, he noticed that end-users' deactivated accounts were often reactivated, and minutes associated with these accounts were billed to the TRS Fund. Initially, Plaintiff assumed the IT department, or some other process at ClearCaptions, would filter out the non-compensable minutes. Although the problem did not fall directly under his area of responsibility, Plaintiff discussed it on several occasions beginning in or about 2017 with Paul Kocher, Mitchell McMahon, Brett Mayhew (Customer Experience Support Manager), Richard Poppert (Customer Experience Manager), Raghu Dhulipala (CIO) and Mike Pontillo (Project Management Director). Plaintiff thought the problem was being handled, but he did not yet understand the scope of the compliance problem.

77.     However, by January 2019, Plaintiff came to realize the problem persisted. He noticed on many occasions that after he personally deactivated an account it would be reactivated shortly after, generating minutes as someone used the telephone associated with the account.[15] As he dug deeper into the problem, he noticed that there would usually be no reasons notated by anyone from ClearCaptions in the Salesforce.com platform for the reactivation of the accounts. On a few occasions he did find that someone at ClearCaptions connected with the customer and legitimately reactivated the account – but that was extremely rare.

---

[15] The Talend software updated Couchbase via the Salesforce.com platform, and vice versa. Thus, the minutes generated on the deactivated accounts, which accumulated in Couchbase, were reflected on the Salesforce.com platform.

78.    Plaintiff realized that no one was interested in fixing the problem, because fewer billable minutes meant lower revenue at a time when ClearCaptions was struggling to not only become profitable, but to simply pay its employees.

## C.    Defendant Knowingly Encouraged Users to Make Compensable Calls

79.    Another way Defendant attempted to increase their compensable billable minutes was to instruct employees, including Plaintiff, to contact customers in a manner that encouraged them to use their telephones to make calls they otherwise would not have made, in violation of § 64.604(c)(13).

80.    The mandatory minimum standards require that an "IP CTS provider shall not engage in any practice that the provider knows or has reason to know will cause or encourage . . . (C) The making of . . . IP CTS calls that would not otherwise be made." 47 C.F.R § 64.604(c)(13)(i)(C). This violation is a condition of payment and material: an "IP CTS provider shall not seek payment from the TRS Fund for any minutes of service it knows or has reason to know are resulting from the practices listed in paragraph (c)(13)(i) of this section." *Id*.

81.    Under pressure from Defendant to find more billable minutes, Rae instructed Plaintiff on or about July 8, 2019, during the regular recurring Monday leadership meeting, to reach out to customers who had ClearCaptions' *Blue* telephone but had few billable minutes.

82.    The "Blue Outreach Project," as it was called in internal memoranda, identified *Blue* telephones that "checked in" on the system (indicating they were hooked up and operational), but that had generated less than five compensable minutes.

83.    From June through August 2019, Plaintiff's team attempted to contact over 2,000 ClearCaptions customers to, on the surface, ask them why they were not using their devices. But Rae's ultimate goal, which was clear internally, was to encourage those customers to make calls they were not

currently making to generate income for ClearCaptions.[16] That was clear because Rae wanted Plaintiff and others to "check on customers" to see if their device was working properly, but only on those who were low users (the devices were obviously working because the devices were "checking in" on the system). Outreach like this was not conducted for customers who generated sufficient compensable minutes.

84.     Defendant knew or should have known this practice would encourage end-users to make calls they would not have made otherwise, in violation of the mandatory FCC rules. Rae instructed Plaintiff and others not to expressly encourage end-users to use the device because he knew that would materially violate FCC rules.

### D.    Defendant's False Certifications to the FCC

85.     Every month since at least February 2017, Defendant has submitted claims to the TRS Fund for reimbursement of its IP CTS minutes. On information and belief, all of those claims included payment for IP CTS minutes from fraudulent calls made by unregistered end-users without certified hearing impairments.

86.     The monthly "Reimbursement Detail Requests" sent by Defendant to the TRS Fund administrator were signed and certified by Rae. On each monthly claim for payment from the TRS Fund, Rae certified that the minutes submitted for reimbursement "were handled in compliance with section 225 of [the] Communications Act and the Commission's rules and orders . . ." Every one of these monthly certifications is false because Defendant knowingly failed to handle its IP CTS minutes in compliance with 47 C.F.R § 64.604(c)(11)(ii); 47 C.F.R § 64.604(c)(13)(i); 47 C.F.R. § 64.606(a)(2)(F); 47 C.F.R. § 64.611(j); 47 U.S. Code § 225(a)-(b); and FCC's *Rule on User Registration and Certification*, CG Docket Nos. 13-24 & 03-123, Public Notice, DA 14-1127 (Aug. 1, 2014).

---

[16] In one week in July 2019, Defendant contacted at least 350 end-users to encourage use.

87.     Moreover, Defendant certified in its Annual Reports and Certification Applications and amendments thereto (all signed by Rae) that pursuant to 47 C.F.R. § 64.606, "they are in compliance with § 64.604" and "they do not and will not request or collect payment from the TRS Fund for service to consumers who do not satisfy the registration and certification requirements."[17]

88.     Defendant directed and ratified all billing practices, submitted or caused the submission of claims for payment, and received federal government payments. ClearCaptions and Rae facilitated and conducted the fraudulent billing practices and submitted or caused the submission of claims for payment. Defendant's knowing submission of false and fraudulent information resulted in the FCC and the TRS Fund administrator receiving and paying claims for call minutes generated by unregistered and/or uncertified end-users that were not properly payable.

## VI.    SWIFT REPORTS HIS CONCERNS AND DEFENDANT RETALIATES

89.     Plaintiff first noted the reactivation of deactivated accounts and billing of non-compensable minutes in early 2017, shortly after joining ClearCaptions. In 2017 and 2018, he discussed the problem with Rae and other management personnel, including Kocher and McMahon.

90.     In or about January 2019, the issues had not be resolved and Plaintiff started discussing this issue with co-workers again. He wanted to make sure ClearCaptions complied with its legal obligations and he did not want his company to get in trouble with the FCC. With the problem continuing in March and April 2019, Plaintiff reported his concerns more aggressively up the chain to Paul Kocher. Kocher admitted this was an ongoing problem and told Plaintiff that he was frustrated by it and that it was unclear why the system reactivated accounts and telephones.

---

[17]  ClearCaptions submitted to the FCC its initial Certification Application on April 18, 2016. ClearCaptions amended its Certification Application on March 15, 2017, December 8, 2017, May 2, 2018, August 21, 2018, and February 15, 2019. ClearCaptions submitted an updated Certification Application on December 27, 2018. ClearCaptions also submitted certified Annual Reports to the FCC, promising no changes to the Certification Applications, on December 15, 2017, December 27, 2018, and December 12, 2019. Rae signed all of these.

91.     The problem was also discussed in Monday leadership meetings beginning in or about February 18, 2019, but nothing was done to address the issue.

92.     In an effort to monitor the problem, Kocher began giving Plaintiff lists of deactivated accounts that the system had reactivated. There were approximately 50-70 accounts on each list, but Kocher told Plaintiff there were so many of these he could not catch them all. Kocher sent Plaintiff lists every week, then every two to three weeks.

93.     Plaintiff used the lists in an attempt to monitor the problem, but it was overwhelming. And, by the summer of 2019, Kocher stopped sending the lists and the problem was neglected as Defendant's constant push for more minutes intensified. Plaintiff continued to discuss the problem with Mitchell McMahon and others, but still, nothing was done.

94.     In or about August and September 2019, Plaintiff discussed the problem with Kody Hugenberg, a Salesforce.com CRM administrator at ClearCaptions. Hugenberg admitted that the software system reverts deactivated customers' records back to active. "Happens all the time," Hugenberg said. He told Plaintiff that he suspected that the Salesforce.com platform exacerbated the problem because it allowed ClearCaptions to bill for minutes generated by uncertified accounts.

95.     In or about July or August 2019, still concerned by Defendant's inaction, Plaintiff resumed his complaints about the problem. For instance, he confronted Kocher in his office about the escalating problem, but Kocher just listened and did not respond. Plaintiff also emailed Mitchell McMahon about deactivations and reactivations. As was becoming the custom of senior management, McMahon did not reply.

96.     On or about September 19, 2019, ClearCaptions Operations Support Analyst, Jessica Plant, notified Plaintiff, Paul Kocher, Brett Mayhew, and Erik Christianson (ClearCaptions Customer Support Representative) by email that she also located numerous deactivated devices that were still making calls: "[The telephones] have been deleted but are still making calls."

97.    On or about September 23, 2019, at a Monday leadership meeting, Plaintiff again brought up the deactivated accounts and telephones. Rae skirted the problem, claiming ClearCaptions was "making progress on system issues." Rae stressed again that everyone needed to be looking for more billable minutes "24/7."

98.    At this point, Plaintiff felt the company was in serious jeopardy, because Defendant was flouting federal regulations by billing for minutes generated by uncertified, unregistered accounts, and they knew it. He also thought Rae and others may be overlooking additional problems that could violate FCC rules and regulations.

99.    On the night of September 23, 2019, Plaintiff emailed Kocher to reignite their previous work on the problem: "Per our conversation today, really want to get a handle on this. Is there anything I or my group can do to assist in correcting this? I'm concerned." Kocher responded in the early morning of the next day, writing "Thanks for reaching out. I'll have the team sink our teeth into this today and report back to you on scope."

100.    Later, on the night of September 23, 2019, Plaintiff emailed Michael Strecker, ClearCaptions' VP of Regulatory & Strategic Policy, about these problems. Plaintiff had not discussed the scheme directly with Strecker in the past, but Plaintiff felt it was finally time to get to the bottom of the fraud. He felt, as he states below, that he had "an obligation to the integrity of the company" to raise and address this problem:

///

///

///

///

**From:** Scott Swift (ClearCaptions) <scott.swift@clearcaptions.com>
**Sent:** Monday, September 23, 2019 10:49 PM
**To:** Mike Strecker (ClearCaptions) <mike.strecker@clearcaptions.com>
**Cc:** Scott Swift (ClearCaptions) <scott.swift@clearcaptions.com>
**Subject:** Regulatory & Compliance

Mike,

As you have heard me discuss during leadership meetings, deactivated accounts and deleted devices are regularly being overwritten by Couchbase or CCWS resulting in active accounts/ active devices. These once deactivated accounts/ devices are then able to make captioned calls should a customer use the deactivated device or if another person were to obtain the device and place a call resulting in captions.

This has been going on for many months. In fact, I have been bringing this to the attention of IT leaders, Product leaders, BI leaders and members of the ClearCaptions leadership team since January, 2019.

BI has been finding many such accounts/ devices resulting in emails to my group to "fix" (changing the override or, once again deactivating the account and restoring it to its original state). In talking with a member of BI today, I was informed "We cannot catch them all" which I find very concerning. This means deactivated captioned calls and thus billable calls are going through our system without being filtered.

This is a very sensitive subject and while I have been more and more vocal about this issue I'm finding less of an audience to listen. Despite that, I have an obligation to the integrity of the company to continue to raise this concern.

I'm coming to you for guidance and would welcome a meeting this week on the matter.
Sincerely,
Scott Swift

101.    Strecker did not respond. Stunningly, a few hours later, on the morning of September 24, 2019, Plaintiff was terminated without explanation in egregious retaliation for objecting to what he reasonably believed was the company's fraudulent practices.

102.    Not only did the termination violate 31 U.S.C. § 3730(h), but the retaliation also violates the whistleblower provision of the FCC's mandatory minimum standards, 47 C.F.R §64.604(c)(5)(iii)(M).

## COUNT I
### (False Claims Act - 31 U.S.C. § 3730(h))
### Retaliation

103.    Plaintiff repeats and realleges the allegations above as if fully set forth herein.

104.    31 U.S.C. § 3730(h) provides, in relevant part, "(1) Any employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions

of employment because of lawful acts done by the employee . . . in furtherance of . . . efforts to stop 1 or more violations of this subchapter."

105.    As described above, Plaintiff raised issues to management, including Defendant Rae, related to his reasonable belief that Defendant were making false representations about the accuracy of the claims they made to the FCC for reimbursement of IP CTS minutes generated by ineligible accounts or telephones. These complaints brought forth potential FCA violations and facts that could reasonably lead to a viable FCA claim.

106.    Plaintiff was then terminated from employment by Defendant on account of his lawful and protected conduct.

107.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered damages.

**WHEREFORE, Plaintiff requests the following relief:**

a.    Double back pay, plus interest;

b.    Compensatory damages for emotional distress and other noneconomic harm, as permitted under 31 U.S.C. § 3730(h)(2);

c.    Attorneys' fees, expenses, and costs of suit herein incurred by or on behalf of the Plaintiff, as permitted under 31 U.S.C. § 3730(h)(2);

d.    An award of pre-judgment interest; and

e.    Such other and further relief as the Court deems just and proper.

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff hereby demands that this matter be tried before a jury.

Date: April 21, 2023                    Respectfully Submitted,

                            /s/ M. Anderson Berry
                            M. Anderson Berry (SBN 262879)
                            aberry@justice4you.com

FIRST AMENDED COMPLAINT

Gregory Haroutunian (SBN 330263)
*gharoutunian@justice4you.com*
**CLAYEO C. ARNOLD,**
**A PROFESSIONAL CORPORATION**
865 Howe Avenue
Sacramento, CA 95825
Telephone: (916) 239-4778
Facsimile: (916) 924-1829

Cliff Palefsky, (SBN 77683)
*cpalefsky@mhpsf.com*
Matthew C. Koski, (SBN 262803)
*mkoski@mhpsf.com*
**MCGUINN, HILLSMAN & PALEFSKY**
535 Pacific Avenue
San Francisco, California 94133
Telephone: (415) 421-9292
Facsimile: (415) 403-0202

*Attorneys for Plaintiff Scott Swift*

## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify the foregoing document is being served today on Defendant's counsel via email pursuant to the parties' written agreement at:

**Douglas W. Baruch**
**Morgan, Lewis & Bockius LLP**
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
Office: (202) 739-3000
Direct: (202) 739-5219
Mobile: (202) 669-0270
Email: *douglas.baruch@morganlewis.com*

*/s/ M. Anderson Berry*
M. Anderson Berry, Esq.
State of California Bar No. 262879