UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT SWIFT, | No. 2:20-cv-00731-MCE-DB |
| Plaintiff, | |
| v. | **MEMORANDUM AND ORDER** |
| CLEARCAPTIONS, LLC, | |
| Defendant. | |

Plaintiff Scott Swift ("Plaintiff") originally initiated this False Claims Act, 31 U.S.C. §§ 3729, et seq. ("FCA"), action as a relator on behalf of the United States of America alleging several claims directly under the FCA, including an FCA retaliation claim, along with claims for unjust enrichment and payment under mistake of fact. ECF No. 1. The United States declined to intervene, ECF No. 16, after which Plaintiff voluntarily dismissed, with the United States' consent, all of the claims in which the United States maintained an interest, leaving only his retaliation claim for adjudication, ECF No. 31. Plaintiff then filed the now operative First Amended Complaint ("FAC"), alleging only one cause of action against Defendant ClearCaptions, LLC, ("Defendant") for retaliation under the FCA, 31 U.S.C. § 3730(h). Very generally, Plaintiff alleges that he believes

1

that after Defendant, a provider of telecommunications captioning for the hearing- and speech-impaired, retaliated against Plaintiff for, as explained in greater detail below, complaining that Defendant was allowing properly deactivated user accounts to be reactivated so they could potentially be utilized by non-impaired users.  Presently before the Court is Defendant's Motion to Dismiss that claim.  ECF No. 41.  For the reasons that follow, that Motion is GRANTED with leave to amend.[1]

## BACKGROUND[2]

### A.  Background on Defendant's Operations

Under Title IV of the Americans with Disabilities Act, the FCC is charged with ensuring the availability of "Telecommunications Relay Services" ("TRS"), which allow hearing or speech-impaired individuals to place telephone calls to other individuals for the same cost as non-disabled callers. To achieve TRS availability, the FCC relies on Internet Protocol Captioned Telephone Service ("IP CTS"), a system designed to allow hearing-impaired individuals to place calls on special telephones provided by one of approximately five IP CTS providers across the country.  Defendant is one such provider.

These special telephones incorporate a screen, similar to an iPad or tablet, that displays real-time captions of what the other party to the conversation is saying. The special telephone connects to the standard telephone line and the internet concurrently; the callers speak over the telephone line, while a Communications Assistant ("CA") employed by the IP CTS provider listens in and captions the call for the hearing-impaired user.

IP CTS providers then get paid from the FCC through its Interstate Cost Recovery

---

[1] Because oral argument would not be of material assistance, the Court ordered this matter submitted on the briefs.  See E.D. Cal. Local R. 230(g).

[2] The following facts are taken, primarily verbatim, from Plaintiff's FAC.

2

Plan (known as the "TRS Fund").  The reimbursement rate is calculated per minute for each captioned call.  Calls involving callers without relevant impairments are not reimbursable by the TRS Fund.  The mandatory minimum standards require that IP CTS providers register their clients with detailed personal information, and require the customer provide a written "self-certification" that they are hearingor speech-impaired.  See 47 C.F.R. § 64.611(j).

To obtain reimbursement from the TRS Fund, each IP CTS provider submits a monthly claim for reimbursement to the TRS Fund administrator for each registered, certified customer.  Each such claim for payment lists the requesting provider's total number of compensable minutes of conversation time, to which the reimbursement rate is applied.  Additionally, providers of TRS are entitled to recover their reasonable costs of providing service in compliance with the FCC's service rules.

To be compensated from the TRS Fund for the costs incurred in providing services to eligible users, IP CTS providers must first be certified by the FCC.  The IP CTS registration and certifications requirements are very specific, setting out exactly how IP CTS providers and users must comply with federal laws.  Applicants must also submit "a description of measures taken . . . to ensure that they do not and will not request or collect payment from the TRS Fund for service to consumers who do not satisfy the registration and certification requirements in § 64.604(c)(9), and an explanation of how these measures provide such assurance."  47 C.F.R. § 64.606(a)(2)(ii)(F).

On a monthly basis, an IP CTS provider, such as ClearCaptions, submits a claim for payment to the FCC for the minutes the provider captioned for end-users.  In each monthly claim for payment, the IP CTS provider must have a senior executive with first-hand knowledge certify that, among other things, compensation requests were handled in compliance with the applicable laws and rules.

### B. Plaintiff's Concerns with Defendant's practices

Since at least February 2017, Plaintiff believes Defendant improperly billed the FCC for IP CTS calls made on its accounts that it knew or should have known were

3

deactivated or otherwise ineligible for FCC reimbursements. For example, if Defendant learned that an end-user has died, the account must be deactivated. Once IP CTS accounts are deactivated, any calls made under the account number or by the associated telephone are unauthorized calls by uncertified and/or unregistered individuals. Of Defendant's approximately 45,000 customers, Plaintiff estimates that 5-10 percent were deactivated on a yearly basis. Plaintiff believed that the minutes generated by deactivated accounts could be in the millions.

Plaintiff was tasked each month with reviewing minutes associated with customer service issues. This included, for instance, end-users' minutes for calls they made to Defendant's customer service lines; Defendant's employees' outbound calls to customers regarding customer service issues; solicitation calls to customers' lines from third-party telemarketers; and any international inbound and outbound calls.

As far back as early 2017, shortly after Plaintiff was hired, he noticed that end-users' deactivated accounts were often reactivated, and minutes associated with these accounts were billed to the TRS Fund. Initially, Plaintiff assumed the IT department, or another of Defendant's processes, would filter out the non-compensable minutes. Although the problem did not fall directly under his area of responsibility, Plaintiff discussed it on several occasions beginning in or about 2017 with multiple members of Defendant's management team. Plaintiff thought the problem was being handled, but he did not yet understand the scope of the compliance problem.

However, by January 2019, Plaintiff came to realize the problem persisted. He noticed on many occasions that after he personally deactivated an account it would be reactivated shortly after, generating minutes as someone used the telephone associated with the account. As he dug deeper into the problem, he noticed that there would usually be no reasons notated by anyone from Defendant for the reactivation of the accounts. On a few occasions he did find that someone had connected with the customer and legitimately reactivated the account – but that was extremely rare.

Plaintiff started discussing this issue with co-workers again. He wanted to make

sure Defendant complied with its legal obligations and he did not want his company to get in trouble with the FCC. With the problem continuing in March and April 2019, Plaintiff reported his concerns more aggressively up the chain to Paul Kocher, the individual responsible for gathering and organizing the information that detailed the billable minutes. Kocher admitted this was an ongoing problem and told Plaintiff that he was frustrated by it and that it was unclear why the system reactivated accounts and telephones. The problem was also discussed in Monday leadership meetings beginning on or about February 18, 2019, but nothing was done to address the issue.

In an effort to monitor the problem, Kocher began giving Plaintiff lists of deactivated accounts that the system had reactivated. There were approximately 50-70 accounts on each list, but Kocher told Plaintiff there were so many of these he could not catch them all. Kocher sent Plaintiff lists every week, then every two to three weeks.

Plaintiff used the lists in an attempt to monitor the problem, but it was overwhelming. Moreover, by the summer of 2019, Kocher stopped sending the lists and the problem was neglected. Plaintiff continued to discuss the problem with members of Defendant's leadership team, but still, nothing was done.

In July or August 2019, still concerned by Defendant's inaction, Plaintiff resumed his complaints about the problem. For instance, he confronted Kocher in his office about the escalating issue, but Kocher just listened and did not respond. Plaintiff also emailed senior management about deactivations and reactivations. As was becoming the custom, they did not reply.

On or about September 23, 2019, at a leadership meeting, Plaintiff again brought up the deactivated accounts and telephones. Management skirted the issue again. At this point, Plaintiff felt the company was in serious jeopardy, because Defendant was flouting federal regulations by billing for minutes generated by uncertified, unregistered accounts, and management knew it. He also thought members of the leadership team may be overlooking additional problems that could violate FCC rules and regulations.

On the night of September 23, 2019, Plaintiff emailed Kocher to reignite their

previous work on the problem: "Per our conversation today, really want to get a handle on this.  Is there anything I or my group can do to assist in correcting this?  I'm concerned."  Kocher responded in the early morning of the next day, "Thanks for reaching out.  I'll have the team sink our teeth into this today and report back to you on scope."

Later, on the night of September 23, 2019, Plaintiff emailed Michael Strecker, Defendant's VP of Regulatory & Strategic Policy, about these problems.  Plaintiff had not discussed the scheme directly with Strecker in the past and sent him an email explaining the issue with deactivated accounts being reactivated stating, in part, that the problem meant "deactivated captioned calls and thus billable calls are going through the system without being filtered."  Strecker did not respond, and Plaintiff's employment was terminated the following morning.

This action followed.

## STANDARD

On a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6),[3] all allegations of material fact must be accepted as true and construed in the light most favorable to the nonmoving party.  Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337–38 (9th Cir. 1996).  Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  A complaint attacked by a Rule 12(b)(6) motion to dismiss does not require detailed factual allegations.  However, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Id. (internal citations and

---

[3] All further references to "Rule" or "Rules" are to the Federal Rules of Civil Procedure.

6

quotations omitted). A court is not required to accept as true a "legal conclusion couched as a factual allegation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 555). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555 (citing 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1216 (3d ed. 2004) (stating that the pleading must contain something more than "a statement of facts that merely creates a suspicion [of] a legally cognizable right of action")).

Furthermore, "Rule 8(a)(2) . . . requires a showing, rather than a blanket assertion, of entitlement to relief." Twombly, 550 U.S. at 555 n.3 (internal citations and quotations omitted). Thus, "[w]ithout some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests." Id. (citing Wright & Miller, supra, at 94, 95). A pleading must contain "only enough facts to state a claim to relief that is plausible on its face." Id. at 570. If the "plaintiffs . . . have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." Id. However, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" Id. at 556 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

A court granting a motion to dismiss a complaint must then decide whether to grant leave to amend. Leave to amend should be "freely given" where there is no "undue delay, bad faith or dilatory motive on the part of the movant, . . . undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of [the] amendment . . . ." Foman v. Davis, 371 U.S. 178, 182 (1962); Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003) (listing the Foman factors as those to be considered when deciding whether to grant leave to amend). Not all of these factors merit equal weight. Rather, "the consideration of prejudice to the opposing party . . . carries the greatest weight." Id. (citing DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 185 (9th Cir. 1987)). Dismissal without leave to amend is proper only if it is clear that

7

"the complaint could not be saved by any amendment." Intri-Plex Techs., Inc. v. Crest Group, Inc., 499 F.3d 1048, 1056 (9th Cir. 2007) (citing In re Daou Sys., Inc., 411 F.3d 1006, 1013 (9th Cir. 2005); Ascon Props., Inc. v. Mobil Oil Co., 866 F.2d 1149, 1160 (9th Cir. 1989) ("Leave need not be granted where the amendment of the complaint . . . constitutes an exercise in futility . . . .")).

## ANALYSIS

"Congress added 31 U.S.C. § 3730(h) to the FCA in 1986 to protect 'whistleblowers,' those who come forward with evidence their employer is defrauding the government, from retaliation by their employer." U.S. ex rel. Hopper v. Anton, 91 F.3d 1261, 1269 (9th Cir. 1996). "[T]here are three elements the plaintiff must prove in any § 3730(h) claim: 1) the employee must have been engaging in conduct protected under the Act; 2) the employer must have known that the employee was engaging in such conduct; and 3) the employer must have discriminated against the employee because of her protected conduct." Id. "Section 3730(h) only protects employees who have acted 'in furtherance of an action' under the FCA." Id. "Specific awareness of the FCA is not required." Id. "However, the plaintiff must be investigating matters which are calculated, or reasonably could lead, to a viable FCA action." Id. According to Defendant, Plaintiff has failed to sufficiently allege any of the elements of a FCA retaliation claim. The Court agrees.

### A. Plaintiff has not alleged that he engaged in protected conduct.

Defendant contends that "[Plaintiff's] concerns regarding account reactivations . . . lack a plausible nexus to the FCA." Def.'s Mot., ECF No. 41-1, at 5. The gist of Defendant's argument is that while Plaintiff focused his complaints and concerns on the reactivation of accounts, he never alleges that he raised concerns regarding whether reactivation was causing Defendant to bill the TRS fund for those improperly reactivated accounts. Rather, Plaintiff's allegations indicate that he was

8

clearly concerned with reactivated accounts, but not that he conveyed to leadership that his concerns related to a fraud component. "[T]he generation of captioned minutes by deactivated accounts alone is not a violation of the FCA, nor does it run afoul of the mandatory minimum standards established for Internet-based TRS providers." Def.'s Mot., ECF No. 41-1, at 5. Defendant would have had to <u>bill</u> for any such minutes to run the risk of falling under the FCA.

The Court agrees that Plaintiff's allegations fall short of alleging that he engaged in conduct protected under the FCA because he does not allege that he raised concerns to Defendant's management team regarding billing practices as opposed to simply just going to reactivation itself. Plaintiff does not allege that those reactivated accounts were actually used to make unauthorized captioned calls or that any such captioned minutes went undetected or were not accounted for. Because Plaintiff does not allege that he was concerned with Defendant's liability for fraud as opposed to, for example, the possibility reactivation was resulting in Defendant wasting company resources captioning calls that would not qualify for reimbursement, he has not alleged his speech was protected under the FCA. See Brazill v. Cal. Northstate College of Pharmacy, LLC, 2012 WL 3204241, at *5 (E.D. Cal. 2012) (no protected conduct where "allegations only suggest that [the plaintiff] was attempting to get the [defendant] to comply with federal law and meet accreditation standards, not that he was trying to recover money for the government or investigating fraud claims").[4]

In opposition, Plaintiff contends that it should be inferred from his complaints that he was alluding to fraud because that is the only reason to have been concerned about the reactivations in the first place. However, not only does Plaintiff not allege in the FAC that there could only be one motivation for bringing forth reactivation concerns, but Defendant has also pointed out other possible motivations, namely the possibility that

---

[4] Plaintiff's general allegations that he expressed his "concerns" or discussed the "problem" or "issue" are too generic and conclusory to be considered. While it is clear that Plaintiff believes Defendant fraudulently billed the FCC, he has not alleged that he conveyed that to Defendant while he was still employed.

Defendant was wasting resources on calls that would not generate revenue, which undermines the argument that everyone essentially should have known what Plaintiff was purportedly thinking.

In addition, Plaintiff argues that he expressed fraud-related concerns in the last email he sent the night before his employment was terminated, where he stated that "deactivated captioned calls and thus billable calls are going through the system without being filtered." FAC, ¶ 100.  Despite use of the word "billable," Plaintiff again does not allege that he was concerned with those calls being billed to the FCC as opposed to with the implications to Defendant directly.  In sum, the Court determines Plaintiff has failed to sufficiently allege that he engaged in protected conduct under the FCA.

**B.     Nor has Plaintiff alleged facts sufficient to establish that Defendant was on notice Plaintiff was engaged in protected conduct.**

As a threshold matter, since the Court has concluded that Plaintiff was not engaged in protected conduct, Defendant obviously could not have been on notice to the contrary.  Even assuming protected conduct occurred, however, for the same reasons already stated, that certainly wasn't communicated to Defendant.  See Hopper, 91 F.3d 1270 ("Even if [the defendant] were intimately familiar with [the plaintiff's] complaints, [the plaintiff] never gave any indication she was investigating the [employer] for defrauding the federal government.").

**C.     Finally, Plaintiff has failed to adequately allege that he was terminated for engaging in conduct he contends was protected.**

Plaintiff contends that the Court should infer from the temporal proximity of his final email and his termination that the two are related.  There are two problems with this argument.  First, Plaintiff had been complaining to members of Defendant's management team for years, beginning in 2017, and then picking back up again at the beginning of 2019, so the fact that his final email corresponded to his termination is not necessarily persuasive.  Plaintiff does not explain why that last email resulted in his termination after he purportedly complained fairly consistently for years.  Second, Plaintiff does not allege that the recipient of that last email could or did take steps to ensure that Plaintiff was

terminated.  There is nothing in the FAC to indicate that the recipient had even read Plaintiff's email at 10:49 p.m. the night prior to the termination, let alone had the opportunity, the resources, or the power to ensure that Plaintiff was terminated the following morning.  Accordingly, Plaintiff's allegations fall short on this element as well.

## CONCLUSION

For the reasons just stated, Defendant's Motion to Dismiss (ECF No. 41) is thus GRANTED with leave to amend.  Not later than twenty (20) days following the date this Memorandum and Order is electronically filed, Plaintiff may, but is not required to, file an amended complaint.  If no amended complaint is timely filed, this action will be deemed dismissed with prejudice upon no further notice to the parties.

IT IS SO ORDERED.

Dated:  February 29, 2024

MORRISON C. ENGLAND, JR
SENIOR UNITED STATES DISTRICT JUDGE